**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION, YOUNGSTOWN**

| | | |
|---|---|---|
| **ANDREW ERDOS, DAVID ANDERSON, and VALLEY VIEW MHP LLC, individually and on behalf of all others similarly situated,** | : : : : | **CASE NO.: _____** |
| **Plaintiffs,** | : : | **JURY TRIAL DEMANDED** |
| **v.** | : : | |
| **NORFOLK SOUTHERN CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY, JOHN DOE(S) 1-20, and ABC CORP(S). 1-20.** | : : : : : | |
| **Defendants.** | : : | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs Andrew Erdos, David Anderson, and Valley View MHP LLC, individually and on behalf a putative class of all other similarly situated ("Class Members" or "Class"), sue Defendants Norfolk Southern Corporation ("NSC"), Norfolk Southern Railway Company ("NSRC"), John Doe(s) 1-20, and ABC Corporation(s) 1-20 (collectively "Defendants"), and based on personal knowledge, investigation of counsel and review of public documents and information, allege as follows:

<u>**INTRODUCTION**</u>

1.     This is a Class Action Complaint seeking redress for residents and businesses located in and around the February 3, 2023 Norfolk Southern Freight Train 32N derailment and subsequent "controlled" release in East Palestine, Ohio, that resulted in contamination of, and exposure to, massive amounts of vinyl chloride and other toxic chemicals—including butyl

acrylate, benzene residue, and other combustible liquids. As a result of this derailment, the Class has suffered, among other things, loss of use and enjoyment of property, property damage, emotional distress, and economic damages as alleged more specifically below.[1]

2.      Vinyl chloride is a highly flammable chemical used to manufacture PVC pipes and bottles. Exposure to vinyl chloride can cause a burning sensation in the eyes or respiratory discomfort. According to the U.S. Environmental Protection Agency (EPA), which has classified vinyl chloride as a Group A human carcinogen, short term exposure to high levels of vinyl chloride through inhalation can cause dizziness, drowsiness, and headaches. Prolonged exposure can result in organ damage and various cancers.

3.      This action is brought by Plaintiffs Andrew Erdos and David Anderson on behalf of themselves and a class of all other similarly situated persons who: (i) own property within the vicinity of the February 3, 2023 train derailment and resulting toxic chemical explosion; or (ii) reside within the vicinity of the February 3, 2023 train derailment and resulting toxic chemical explosion and were forced to (a) evacuate their homes, or (b) shelter within their homes due to the incident.

4.      This action is also brought by Plaintiff Valley View MHP LLC, on behalf of itself and a class of all other similarly situated businesses that were forced to close, and/or were otherwise adversely affected by the February 3, 2023 train derailment and resulting toxic chemical explosion.

---

[1] These events are herein referred to as the train derailment and resulting toxic chemical explosion.

## THE PARTIES

5.     At all relevant times, Plaintiff Andrew Erdos was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 73 Madden Run Rd, New Galilee, Beaver County, PA, 16141, within five miles of the derailment and explosion site.

6.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Plaintiff Andrew Erdos has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

7.     At all relevant times, Plaintiff David Anderson was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 377 Echo Valley Road, New Galilee, Beaver County, PA, 16141, within five miles of the derailment and explosion site.

8.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Plaintiff David Anderson has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

9.     At all relevant times, Plaintiff Valley View MHP LLC was a Pennsylvania domestic limited liability company with a principal place of business located at 377 Echo Valley Road, New Galilee, Beaver County, PA 16141, within five miles of the derailment and explosion site.

10.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Plaintiff Valley View MHP LLC has suffered a loss of business income and goodwill, and its real property has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

11.     Defendant NSC is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

12.     Defendant NSRC is a wholly owned subsidiary of NSC.  NSRC is a Class I railroad corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

13.     NSRC operates approximately 19,300 route miles (in 22 states and the District of Columbia) with 2,402 route miles (12%) in the Commonwealth of Pennsylvania alone, and serves every major container port in the eastern United States.

14.     According to the Federal Railroad Administration ("FRA"), NSRC had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 67 accidents total— 22 in 2019, 18 in 2020, 15 in 2021 and 13 in 2022.

15.     According to the FRA, NSRC also had the most derailments of all railroad companies in Pennsylvania. This includes 74 total accidents (89.2% of all derailments in Pennsylvania) from 2019 to 2022—23 in 2019, 14 in 2020, 23 in 2021, and 14 in 2022.

16.     At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

17.     Defendant John Doe(s) 1-20 are defendants whose identities are unknown to Plaintiffs at this time despite Plaintiffs' counsel conducting a reasonable search with due diligence, but when those parties' true identifies are discovered, the pleadings will be amended by substituting their true names and giving proper notice to these parties. These Defendants include, but are not limited to, engineers, conductors, and conductor trainees, and/or any individuals that, at any time relevant to these proceedings, negligently caused or contributed to the train derailment, and whose negligence and breaches caused or contributed to cause Plaintiffs' damages and injuries. As such, Plaintiffs are using the fictitious designation of Defendant John Doe(s) 1-20.

18.     Defendants ABC Corporation(s) 1-20 are defendants whose identities are unknown to Plaintiffs at this time despite Plaintiffs' counsel conducting a reasonable search with due diligence, but when those parties' true identifies are discovered, the pleadings will be amended by substituting their true names and giving proper notice to these parties. These Defendants include, but are not limited to, sellers, suppliers, distributors, and manufacturers that, at any time relevant to these proceedings manufactured the toxic substances, prepared and loaded the toxic substances for travel, supplied, operated, inspected, repaired or maintained the railway cars, parts, axles, or supplies, and whose negligence and breaches caused or contributed to cause Plaintiffs' damages and injuries. As such, Plaintiffs are using the fictitious designation of Defendant ABC Corporation(s) 1-20.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because there is complete diversity between Defendants and at least one member of the class; there are more than one hundred members of each class; and the amount in controversy exceeds $5,000,000 exclusive of interests and costs.

20.     On information and belief, Defendants have systematically transacted and conducted business in the State of Ohio, including transportation of hazardous materials by train, and these causes of action arise, in part, from the same.

21.     On information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the State of Ohio.

22.     On information and belief, at all relevant times, Defendants derived and continue to derive substantial revenue from providing services in the State of Ohio.

23.     On information and belief, at all relevant times, Defendants committed tortious acts within the State of Ohio causing injury within the State of Ohio, out of which act(s) these causes of action arise.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred, in part, in the Northern District of Ohio, Representative Plaintiffs were injured as a result of tortious activity in this District and Defendants otherwise have sufficient contacts with this District to justify it being fairly brought into this District.

## FACTUAL ALLEGATIONS

*The Train Derailment*

25.     On Friday February 3, 2023, at approximately 9:00 p.m., Norfolk Southern Freight Train 32N, consisting of 141 cars and operated by NSRC, was carrying abnormally dangerous and ultrahazardous chemicals including, but not limited to, vinyl chloride, while traveling from Illinois to Pennsylvania.

26.     The train was backloaded with 40% of its weight, the heaviest tanker cars, at the rear. Lighter cars were loaded between the heavy rear tankers and the front engine.

27.     The train was traveling from Madison County, Illinois to Conway, Pennsylvania, which required a downhill route.

28.     In the area of East Palestine, Ohio, approximately 50 of the train cars derailed.

29.     The train was already ablaze when at 8:13 P.M it passed through Salem, Ohio, 20 miles west of the eventual site of the fiery derailment in East Palestine.

30.     Shortly before the derailment, the crew was alerted by an alarm indicating a mechanical issue with a malfunctioning railcar axle.

31.     The railcar axle failed when a wheel bearing overheated on a railcar.

32.     The overheating led to a fire, which then led to the derailment.

33.     An emergency brake was then applied prior to the derailment.

34.     Ten of the derailed cars carried hazardous materials, with five of those derailed train cars containing vinyl chloride.

35.     During and after the derailment the hazardous chemicals, including, but not limited to vinyl chloride, ignited, and the resulting fire continued to burn with increasing intensity the following Saturday, Sunday, and Monday (February 3-6, 2023).

36.     On Friday February 3, 2023, the fire was large enough to be detected by the Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak intensity around 10:40 p.m. when brighter colors appeared on radar and the smoke plume had traveled below Beaver Falls, Pennsylvania.

37.     The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of moderate rain/snow.  The smoke plume was blown to the south and east due to a northwest wind that was blowing over the fire, traveling at least as far as Bridgewater, Pennsylvania at that time.

38.     Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from their exterior labels.

39.     Officials issued a shelter-in-place order for the entire town of East Palestine, affecting roughly 5,000 people, and an evacuation order was put in effect within a mile of the train derailment at 1020 East Taggart Street as of early Saturday, February 4, 2023.

40.     Upon information and belief, one railcar carrying vinyl chloride became a focus of concern when its malfunctioning safety valves prevented the release of the chemical inside, meaning that pressure was building to unsafe levels inside the steel shell.

41.     On Sunday, February 5, 2023, as the fires continued to burn, temperature increases raised fears of a catastrophic tanker failure, which could cause an explosion with the potential of deadly shrapnel.

42.     On Monday, February 6, 2023, a drastic temperature change took place within the railcar with malfunctioning safety valves, increasing the potential of a catastrophic tanker failure

and explosion that could release not only toxic chemicals, but also deadly shrapnel traveling up to one mile.

43.     At 4:30 p.m. on Monday, February 6, 2023, NSC and/or NSRC intentionally blew holes in each of the five derailed rail cars containing vinyl chloride to drain the chemical into a trench where flares would then ignite and burn the vinyl chloride away.

44.     This process was referred to as a "controlled release." Following the explosive and fiery "controlled release," a large plume of thick black smoke formed a mushroom cloud, which dispersed toxic hydrogen chloride and phosphene gas into the atmosphere, causing further contamination by, and exposure to, toxic chemicals.

45.     Phosgene is a highly toxic gas that can lead to choking, chest constriction and, in the most acute exposures, possibly even death.  Phosgene is so toxic that it was used as a chemical weapon in World War I.

46.     Upon information and belief, the "controlled release" of vinyl chloride released hundreds of thousands of pounds of phosgene into the air.

47.     Hydrogen chloride, which has a pungent odor, can irritate the throat, nose and skin. Hydrogen chloride is extremely unstable and bonds with water in the atmosphere to form hydrochloric acid.

48.     Upon information and belief, the "controlled release" of vinyl chloride released hundreds of thousands of pounds of hydrochloric acid into the air.

49.     The smoke from the "controlled release" was trapped from rising higher into the atmosphere due to an inversion layer at around 3,000 feet.  In other words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable to continue to rise vertically, so it began to spread out horizontally in a thick cloud.

50.     Fumes, sediment, and a rise in particulate pollution from the derailment, fire, toxic chemical disbursement and subsequent explosion have been reported throughout an area encompassing at least 30 miles around the derailment site.

51.     For example, the EPA particulate pollution monitor in Youngstown, Ohio, more than 23 miles from the derailment site, more than tripled in amount of small particles in the air on February 6, 2023, and continued to rise. As of February 9, 2023, the particulate levels in Youngstown, Ohio were five times higher than they were prior to February 6, 2023

52.     Upon information and belief, persons in Beaver County, Pennsylvania, and Lawrence County, Pennsylvania, reported experiencing noxious fumes, numbed tongues and lips from the derailment, fire, toxic chemical disbursement and subsequent explosion.

53.     Upon information and belief, contamination and damage to local streams, rivers and other bodies of water including, but not limited to, the Ohio River, occurred from the release of toxic chemicals and/or the water runoff from the derailment and resulting chemical explosion, leading to the death of fish, wildlife, and other local farm or household animals.

54.     Upon information and belief, the derailment, subsequent chemical spill, fire and toxic explosion were caused by the negligence, carelessness, recklessness, and/or intentional acts of the Defendants in the ownership, operation, inspection, maintenance and repair of the subject train, rail cars, and track system, as well as the design and performance of the "controlled release."

*The Hazards of Vinyl Chloride*

55.     Vinyl chloride monomer ("vinyl chloride") is classified by the EPA as a Group A human carcinogen—the most dangerous to human health.

56.     Vinyl chloride exposure can affect the cardiovascular, respiratory, and central nervous systems, and can cause death, difficulty breathing, lung irritation, chest pains, coughing, dizziness, headaches, eye irritation and loss of consciousness.

57.     Vinyl chloride is a toxic chemical that is unstable and prone to explode if not maintained and handled with proper methods and conditions.

58.     Specifically, just minutes of exposure to high, but attainable concentrations (over 1,000 ppm) of vinyl chloride may cause central nervous system depression with effects such as dizziness, drowsiness, disorientation, tingling, numbness or burning sensation of the hands and feet, impaired vision, nausea, headache, difficulty breathing, cardiac arrhythmias, unconsciousness, or even death.

59.     Exposure to higher concentrations of vinyl chloride can cause death due to central nervous system and respiratory depression.

60.     Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

61.     According to the National Transportation Safety Board ("NTSB"):

Vinyl chloride [CAS # 75-01-4] is a colorless gas with a mild, sweet odor that is used to make polyvinyl chloride (PVC). It is a gas at room temperature; however, it is shipped as a liquid under pressure. It is highly flammable and vapor/air mixtures are explosive. The odor threshold for detection is about 3,000 parts per million (ppm) in air. The Occupational Safety and Health Administration (OSHA) regulates occupational exposures to vinyl chloride under 29 CFR 1910.1017. Paragraph (c) of the standard mandates that no employee may be exposed to vinyl chloride at concentrations greater than 1 ppm averaged over any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride. ***Due to the significant difference between the odor threshold and the acceptable occupational exposure levels, workers can easily be overexposed without becoming aware of vinyl***

11

_**chloride's presence**_. **_The odor threshold is too high to provide adequate warning for hazardous concentrations_**.

62.     Just one pound of vinyl chloride released into the atmosphere can contaminate five acres to a level of 2 ppm.

63.     Upon information and belief, the train derailment and resulting toxic chemical explosion released approximately **_1,000,000 pounds_** of vinyl chloride.

## CLASS ALLEGATIONS

64.      Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of themselves and a class of all other similarly situated for all direct, proximate and foreseeable losses caused by the February 3, 2023 train derailment, fire and resulting toxic chemical explosion.  The Class is hereby defined as follows:

> **All individuals who resided, owned property, worked or operated businesses within a 30-mile radius of 1020 East Taggart Street, East Palestine, Ohio 44413 as of February 3, 2023 ("the Class Zone").**



*Fig. 1: The Class Zone is represented by a radius of 30 miles emanating from the derailment, fire and explosion site.*



*Fig. 2: Close up of the center of the Class Zone. The evacuation area inside the Class Zone is represented and encompassed within the blue circle, and the shelter in place area is encompassed within the green circle.*

65.     Excluded from the Class are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class; government entities; and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the February 3, 2023 train derailment and resulting toxic chemical explosion, arise out of a right of subrogation, whether equitable, contractual or otherwise.

66.     Also excluded from the Class are any claims of physical manifestation of personal or bodily injury.

67. Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct additional investigation and discovery.

68. The proposed Class meets the criteria for certification under 23(a) and 23(b)(1) and/or (b)(3).

*Numerosity and Ascertainability*

69. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.

70. While the exact number of Class Members is unknown to Plaintiff at this time, it is ascertainable; the proposed Class includes thousands of residents and businesses who were unlawfully exposed to vinyl chloride and other toxic chemicals or who had property contaminated by unlawful exposure to vinyl chloride and other toxic chemicals and suffered damages. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

*Predominance of Common Issues*

71. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law and fact that predominate over any individual Class Members.

72. The common questions include, without limitation, the following:

    a) Whether Defendants' acts or omissions as set forth above caused the accident resulting in the derailment, fire, subsequent leak of toxic chemicals, resulting explosion, contamination and evacuation and/or "shelter in place" orders;

14

b)      Whether the Plaintiffs and Class Members have suffered a loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or other economic damages as a result of the Defendants' acts or omissions as set forth above;

c)      Whether Plaintiffs' and Class Members' businesses have suffered a loss of income and/or diminution in value due to either (i) the leak of vinyl chloride or (ii) the stigma associated with being within the evacuation and/or "shelter in place" zones;

d)      Whether Plaintiffs and Class Members have suffered damages to their businesses due to forced closings and/or the evacuation or "shelter in place" orders;

e)      Whether Defendants are liable to Plaintiff and the Class for punitive damages resulting from the derailment and vinyl chloride spill;

f)      Whether Defendants breached their duty to warn Plaintiffs and the Class of and to protect Plaintiff and the Class from the long-term health risks and consequences of exposure to high levels of vinyl chloride and other toxic chemicals;

g)      Whether medical monitoring and early detection will provide benefits to Plaintiffs and the Class; and

h)      Whether Plaintiffs and the Class are entitled to relief.

*Typicality*

73.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants.

74.    Plaintiffs own property, reside in and/or operate a business within the Class Zone surrounding the train derailment and toxic chemical explosion, and owned property, resided and/or operated a business in the Class Zone for at all relevant times.

75.    Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

76.    Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

77.    Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

*Adequacy*

78.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and environmental toxic tort litigation, including successful class actions involving mass displacements caused by the release of dangerous substances that are similar to that at issue here.[2]

79.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class Members.

80.    Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

*Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members'*
*Interests*

81.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1); a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

---

[2] *See In re. Columbia Gas Cases*, Civil Action No. 1877CV01343G, Superior Court of the Commonwealth of Massachusetts (granting final approval of a $143 million class action settlement on March 12, 2020).

82.     The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation.

83.     Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable.

84.     Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

85.     By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

*Superiority*

86.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and the interpretation of the common language in their insurance policies predominate over any questions affecting only individual Class Members.

87.     Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the

prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

88.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

89.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

**SUPPLEMENTAL MEDICAL MONITORING CLASS ALLEGATIONS**

90.     As set forth above, Plaintiffs are not asserting claims for the physical manifestation of a current toxicity injury, and have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

91.     Plaintiffs seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

92.     As a direct and proximate result of Defendant's wrongful conduct as set forth above, Plaintiffs and the Class Members have been exposed to toxic substances, toxic fumes and carcinogens and thereby suffer, and will continue to suffer a significantly increased risk of serious injury and diseases. This increased risk makes periodic diagnostic medical testing and examinations necessary.

93.     Medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure to vinyl chloride and other toxic substances released by the derailment, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and wellbeing of Plaintiffs and the Class Members they seek to represent. Medical monitoring and testing procedures, including clinical examinations, exist which make the early detection of exposure to toxic substances, toxic fumes and carcinogens, and early detection of disease, feasible and beneficial.

94.     The increased susceptibility to injuries and irreparable threat to the health of the Plaintiffs and members of the Class resulting from their exposure to vinyl chloride and other toxic substances can be appropriately mitigated and addressed only by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendant, that: (a) notifies individuals who have been exposed to vinyl chloride and other toxic substances of the potential harm from such exposure and the need for periodic testing and examination; (b) provides early detection and treatment of disease and injuries caused by exposure to vinyl chloride and other

toxic substances; and (c) gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to vinyl chloride and other toxic substances.

95. Establishment of a Court-supervised medical monitoring regimen can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for, the above-referenced activities, and those needed examination and testing procedures which Class members actually undergo, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

96. The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, product warnings and education programs are a matter for the Court to decide, after hearing and consultation with medical, warnings, industrial, and other experts, and class adjudication that the right to this relief is appropriate and necessary.

97. The medical monitoring program should be generally supervised by the Court and may be directly managed by Court-appointed, Court-supervised special masters or trustees.

98. The program should involve the monitoring of all Class Members by designated physicians under a Court-approved medical treatment and research regiment.

99. The program should involve the collection of medical data utilized for group studies, as well as monitoring and treatment of individuals.

100. During program administration, Defendants should address issues implicated by program administration as they develop.

101.     By reason of the Defendants' conduct, members of the Class have suffered and will continue to suffer latent, undiagnosed and impending irreparable injury, warranting a preliminary injunction and an expedited trial on the merits under Fed. R. Civ. P. 65, and a permanent decree granting the relief requested herein. Plaintiffs and the Class they seek to represent will suffer irreparable injury unless the Court so acts.

### COUNT I
### NEGLIGENCE
*(On Behalf of All Plaintiffs Against All Defendants)*

102.     Plaintiffs repeat, reallege, and incorporate by reference all allegations in Paragraphs 1 through 101 as if fully set forth herein.

103.     The derailment, fire, leak of vinyl chloride and explosion of toxic chemicals was caused by the negligence, carelessness and/or recklessness of the Defendants.

104.     Upon information and belief, Plaintiffs aver that the derailment, fire, leak of vinyl chloride and explosion of toxic chemicals was caused by the joint negligence, carelessness and/or recklessness of the Defendants, and is the fault of the Defendants as set forth above.

105.     In addition, and in the alternative, the derailment, fire, leak of vinyl chloride and explosion of toxic chemicals was caused by defective, unfit and/or unsafe equipment, which was in the care, custody and control of Defendants.  Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

106.     Defendants owed Plaintiffs and the Class a duty to use reasonable care in the transportation of hazardous materials through East Palestine, Ohio. Consistent with federal regulations and industry practices and procedures, these duties include, but are not limited to, the duty to:

      a.  Operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous

materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible liquids;

b.  Ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

c.  Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials.

d.  Ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

e.  Prevent over-loading the train with too many railcars or materials;

f.  Load the railcars consistent with accepted practice;

g.  Load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h.  Adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

i.  Hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of the train on February 6, 2023;

j.  Train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of the train and issues that arose on February 3, 2023;

k.  Properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of the train on February 3, 2023;

l.  Ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

m. Properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

n.  Route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

o. Adequately warn those in danger of exposure to hazardous chemicals;

p. Institute proper procedures and training for response to the mechanical malfunction of a rail car;

q. Institute proper procedures and training for response to derailment of railcars containing hazardous materials;

r. Institute proper procedures to avoid exposing hazardous materials to the environment;

s. Have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

t. Timely implement such an emergency response plan;

u. Transport and handle hazardous materials in a manner which would not cause Plaintiffs harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

v. Properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

w. Evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

x. Timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y. Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, to persons at risk of exposure, including those outside the evacuation zone;

z. Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

aa. Contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, into the surrounding air, water, real property, and persons.

107.    However, inconsistent with federal regulations and industry practice and procedures, Defendants negligently, carelessly and/or recklessly, breached their duties to Plaintiffs and the Class by, among other things:

    a.  Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible liquids;

    b.  Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

    c.  Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

    d.  Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

    e.  Failing to prevent over-loading the train with too many railcars or materials;

    f.  Failing to load the railcars consistent with accepted practice;

    g.  Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

    h.  Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

    i.  Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of the train on February 6, 2023;

    j.  Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of the train and issues that arose on February 3, 2023;

    k.  Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of the train on February 3, 2023;

    l.  Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and

trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

m. Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

n. Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

o. Failing to adequately warn those in danger of exposure to hazardous chemicals;

p. Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

q. Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

r. Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

s. Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

t. Failing to timely implement such an emergency response plan;

u. Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct.

v. Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

w. Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

x. Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y. Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, to persons at risk of exposure, including those outside the evacuation zone;

    z.  Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

    aa. Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, into the surrounding air, water, real property, and persons in order to avoid injury to;

    bb. Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids; and

    cc. Otherwise unreasonably causing injury to Plaintiff in ways further investigation and discovery will reveal.

108.    Defendants owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, including vinyl chloride, butyl acetate, benzene residue, and combustible liquids by railcar.

109.    Defendants owed and breached a duty of reasonable care commensurate with the release and burning of those hazardous materials, including the resultant release of phosgene, and hydrogen chloride.

110.    Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendants had a duty to investigate the extent to which the controlled release and burn of hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride was likely contaminating property at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

111.    The damages to Plaintiffs and class members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

112.    As a direct and proximate result of Defendants' use, emission, discharge, disposal, distribution and release of hazardous materials throughout a 30-mile radius surrounding the derailment site, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

113.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT II
## STRICT LIABILITY
*(On Behalf of All Plaintiffs Against All Defendants)*

114.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in Paragraphs 1 through 101 as if fully set forth herein.

115.    Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

116.    The transportation of the toxic and flammable substance vinyl chloride is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

117.    The Defendants engaged in an abnormally dangerous and/or ultrahazardous activity for which common law strict liability applies for transporting hazardous substances, including but

not limited to vinyl chloride, through a residential community in a manner the Defendants knew to be dangerous and without taking proper precautions.

118.     Had the Defendants not engaged in the abnormally dangerous and/ or ultrahazardous activity, Plaintiffs would not have had their property contaminated or been exposed to dangerous levels of vinyl chloride or other toxic substances and endured the other damages set forth herein.

119.     As a direct and proximate result of the Defendants' acts or omissions in the course of conducting this abnormally dangerous and/or ultrahazardous activity, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

120.     Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs and the Class as described above.

121.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT III
## MEDICAL MONITORING
*(On Behalf of Plaintiffs Erdos and Anderson Against All Defendants)*

122.   Plaintiffs repeat, reallege, and incorporate by reference all allegations in Paragraphs 1 through 101 as if fully set forth herein.

123.   Plaintiffs Erdos, Anderson, and the individual Class Members have been significantly exposed to vinyl chloride and other toxic substances at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that has been proven to cause cancer and other diseases in humans.

124.   The hazardous materials carried by the train, including vinyl chloride, are highly toxic substances.

125.   Plaintiff and Class Members were significantly exposed to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, due to Defendants' tortious actions, including Defendant's negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

126.   As a proximate result of their exposure to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, Plaintiffs and Class Members have a significantly increased risk of developing diseases and cancer, including liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's syndrome and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

127.   This increased risk will warrant a reasonable physician to order monitoring.

128.   Early diagnosis of these diseases and cancers has significant value for members of the Class because such diagnoses will help them monitor and minimize the harm therefrom.

129.     Monitoring procedures exist that makes early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different than that normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiffs' and Class Members' exposures to the toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, released by the derailment, fire, and explosion.

130.     Due to Plaintiffs' and the Class's exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of the harmful and debilitating injuries resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

131.     As a result, Plaintiff and the Class should be awarded the quantifiable costs of such a monitoring regime.

132.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT IV
## PRIVATE NUISANCE
*(On Behalf of All Plaintiffs Against All Defendants)*

133.     Plaintiffs repeat, reallege, and incorporate by reference all allegations in Paragraphs 1 through 101 as if fully set forth herein.

134.     At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, other combustible liquids, phosgene, and hydrogen chloride were hazardous and harmful to real property and human beings, and it was substantially

certain that improper transportation and handling of these materials would cause injury to Plaintiffs and their property.

135. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in the 30-mile radius surrounding the East Palestine derailment site.

136. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have released vinyl chloride, butyl acrylate, benzene residue, other combustible liquids, phosgene, and hydrogen chloride onto Plaintiffs' land and have contaminated Plaintiffs' real property, water and persons.

137. The Defendants' contamination of Plaintiffs' real and personal property with vinyl chloride, butyl acrylate, benzene residue, and other toxic substances has unreasonably interfered with the rights of Plaintiffs to use and enjoy their property, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens, or water pets and livestock. This has, in turn, caused significant loss of income, out of pocket expenses, emotional distress and inconvenience.

138. Defendants' conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

139. Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

140. Plaintiffs, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious conduct, including the pollution of their land and water.

141. Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, and the contamination of Plaintiffs' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs to presently suffer, and continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

142. Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT V
## PUBLIC NUISANCE
*(On Behalf of All Plaintiffs Against All Defendants)*

143. Plaintiffs repeat, reallege, and incorporate by reference all allegations in Paragraphs 1 through 101 as if fully set forth herein.

144. At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation and handling of these materials was hazardous and harmful to people living in nearby areas.

32

145.    Plaintiffs and Class Members have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running water without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

146.    Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids substantially and unreasonably infringed upon and transgressed these public rights.

147.    As a proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiffs' and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

148.    As a proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Defendants invaded and contaminated the areas surrounding Plaintiffs' and Class Members' residences, thereby exposing them to toxic chemicals and carcinogens.

149.    As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for annoyance, upset, aggravation and inconvenience, increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

150. Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VI
## STATUTORY NUISANCE
*(On Behalf of All Plaintiffs Against All Defendants)*

151. Plaintiffs repeat, reallege, and incorporate by reference all allegations in Paragraphs 1 through 101 as if fully set forth herein.

152. Per Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6, it is impermissible to emit air pollutants of hazardous materials in amounts greater than those sent by the Clean Air Act.

153. Section 112 of the Clean Air Act included vinyl chloride in the list of hazardous air pollutants and set a national emission standard. 41 Fed. Reg. 46560 (1976).

154. 35 P.S. § 4013 declares any violation of the Air Pollution Control Act "shall constitute a public nuisance," and "[a]ny person who causes the public nuisance shall be liable for the cost of abatement."

155. Similarly, per Ohio R.C. § 3704.03, "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

156. As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride.

157. As a result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiff and Class Members have been exposed to hazardous air pollutants in violation of Pennsylvania, Ohio, and federal law.

34

158.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs, thereby exposing their properties and body to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids.

159.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, and the exposure to these toxins resulting therefrom, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

160.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VII
## TRESPASS
### (On Behalf of All Plaintiffs Against All Defendants)

161.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in Paragraphs 1 through 101 as if fully set forth herein.

162.    At all times relevant hereto, Defendants knew or should have known vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride to be hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their use, emission,

discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiff and their property.

163. Defendants, through their activities alleged herein, allowed hazardous materials to enter and contaminate Plaintiffs' property. They intentionally, knowingly, and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs.

164. Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride and/or other combustible liquids to enter and contaminate Plaintiffs' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused hazardous materials to enter Plaintiffs' land and water.

165. At all relevant times Defendants were aware that their conduct in disposing of vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride, and other combustible liquids was contrary to Plaintiffs' rights in their property.

166. At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' rights to their land.

167. Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the matter of an ordinary, careful person or business.

168. The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with hazardous materials has interfered with the rights of Plaintiffs to use and enjoy their property and constitutes trespass and

continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

169. Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs so choose.

170. Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress.

171. Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VIII
## WILLFUL AND WANTON CONDUCT
*(On Behalf of All Plaintiffs Against All Defendants)*

172. Plaintiffs repeat, reallege, and incorporate by reference all allegations in Paragraphs 1 through 101 as if fully set forth herein.

173. At all times relevant, Defendants owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class.

174. Upon information and belief, Defendants were, at all times relevant, aware that vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride are highly carcinogenic, mutagenic and/or otherwise harmful to humans.

37

175.    Upon information and belief, Defendants were, at all times relevant, aware of the considerable health risks associated with the release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride into the air, water, and land, including the risk of causing various diseases and cancers in the surrounding population.

176.    Upon information and belief, Defendants were, at all times relevant, aware that their transportation and release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

177.    Upon information and belief, Defendants were, at all times relevant, aware that at least one railcar was malfunctioning for at least 20 miles before the derailment occurred.

178.    Notwithstanding this actual knowledge, and inconsistent with federal regulations and industry practice and procedures, Defendants breached their duties by, among other things:

    a.  Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible liquids;

    b.  Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

    c.  Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

    d.  Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

    e.  Failing to prevent over-loading the train with too many railcars or materials;

    f.  Failing to load the railcars consistent with accepted practice;

    g.  Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h.  Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

i.  Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of the train on February 6, 2023;

j.  Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of the train and issues that arose on February 3, 2023;

k.  Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of the train on February 3, 2023;

l.  Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

m.  Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

n.  Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

o.  Failing to adequately warn those in danger of exposure to hazardous chemicals;

p.  Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

q.  Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

r.  Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

s.  Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

t.  Failing to timely implement such an emergency response plan;

39

u.  Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct.

v.  Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

w.  Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

x.  Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y.  Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, to persons at risk of exposure, including those outside the evacuation zone;

z.  Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

aa. Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, into the surrounding air, water, real property, and persons in order to avoid injury to;

bb. Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids; and

cc. Otherwise unreasonably causing injury to Plaintiff in ways further investigation and discovery will reveal.

179.  Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and Class Members.

180.  As a direct and proximate result of Defendants' willful, wanton, reckless and outrageous transportation, emission, discharge, and release of hazardous materials, including vinyl

chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride, throughout the Class Zone, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

181.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against each Defendant as follows:

a.      For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

b.      For damages, including compensatory, punitive and exemplary damages, in an amount determined just and reasonable;

c.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

d.      For prejudgment interest on all amounts awarded;

e.      For injunctive and declaratory relief, as allowed by law; and

f.      Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: February 9, 2023

Respectfully submitted,


  /s/ Melanie S. Bailey

Melanie. S. Bailey (OH 0075821)
David C. Harman (OH 0087882)
**BURG SIMPSON ELDREDGE**
**HERSH & JARDINE, P.C.**
201 East Fifth Street, Suite 1340
Cincinnati, OH 45202
513-852-5600
513-852-5611 (fax)
mbailey@burgsimpson.com
dharman@burgsimpson.com

Seth Katz*
**BURG SIIMPSON ELDREDGE**
**HERSH & JARDINE, P.C.**
40 Inverness Drive East
Englewood, CO 80112
303-792-5595
303-708-0527 (fax)
skatz@burgsimpson.com

M. Elizabeth Graham, Esq.*
Adam J. Gomez, Esq.*
Tudor I. Farcas, Esq.*
Adam l. Stoltz, Esq.*
Caley DeGroote, Esq.*
**GRANT & EISENHOFER, P.A.**
123 S. Justison Street, 6th Floor
Wilmington, DE 19801
302-622-7000
302-622-7100 (fax)
egraham@gelaw.com
agomez@gelaw.com
tfarcas@gelaw.com
astoltz@gelaw.com
gdegroote@gelaw.com

Douglas J. Olcott, Esq. (OH 0098596)
**EDGAR SNYDER**
**& ASSOCIATES, LLC**

42

600 Grant Street, 10th Floor
Pittsburgh, PA 15219
412-394-4420
412-391-2386 (fax)
dolcott@edgarsynder.com

*Attorneys for the Plaintiffs and
the Putative Class*

*\*Pro Hac Vice Forthcoming*