IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| ANDREW ERDOS, DAVID ANDERSON, and VALLEY VIEW MHP LLC, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>)<br>) Case No. 4:23-cv-00268-BYP |
| Plaintiffs, | ) |
| v. | ) |
| NORFOLK SOUTHERN CORPORATION; NORFOLK SOUTHERN RAILWAY COMPANY; JOHN DOE(S) 1-20; and ABC CORP(S). 1-20, | )<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>) |
| Defendants. | ) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

AND NOW, come Defendants, Norfolk Southern Corporation ("NSC") and Norfolk Southern Railway Company ("NSR"), by and through their attorneys, Dickie, McCamey & Chilcote, P.C., and file the within Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, stating as follows:

**I. INTRODUCTION**

Plaintiffs in this action request that this Court enter a broad and unlimited prohibition on Norfolk Southern's efforts to remediate the site of the February 3, 2023 derailment that occurred in East Palestine, Ohio as required by the United States Environmental Protection Agency ("EPA"). The EPA, State of Ohio Environmental Protection Agency ("Ohio EPA"), and the residents of East Palestine, Ohio all want to remove hazardous waste and other waste from the site as quickly as possible.

1

On February 26, Debra Shore, Regional Administrator for EPA Region 5 said, "as I stated yesterday, we owe it to East Palestine and residents nearby to move waste out of the community as quickly as possible, and that's exactly what we're working to do." *See* [EPA, FEMA officials hold press conference on recovery efforts in East Palestine (cleveland19.com)](). Anne M. Vogel, Director of Ohio EPA, stated that all of the railcars except the cars held by the NTSB have been removed from the site which is "critically important" so that additional contaminated soil can be excavated and monitoring wells can be installed at the site of the derailment. *Id.* The monitoring wells will evaluate whether there is any contamination to ground water "which is critically important to the mission of the Ohio EPA to ensure the health of the residents of East Palestine and the environment here." *Id.*

In this regard, on February 24, 2023, the EPA, pursuant to the National Contingency Plan, 40 C.F.R. § 300.120(e), issued a letter <u>directing</u> NSR to:

1. On February 24, 2023, initiate removal and proper off-site disposal of all stockpiled contaminated soil at the derailment location. The disposal location and transportation route(s) shall be subject to EPA approval. The removal and disposal of the soil shall be completed on or before the close of business on March 4, 2023.

2. On February 24, 2023, initiate removal and proper off-site disposal of all remaining residue in tank cars at the derailment location. The disposal location transportation route(s) shall be subject to EPA approval. The removal and disposal of the residue shall be completed on or before the close of business on March 10, 2023.

3. On or before March 1, 2023, initiate removal and proper off-site disposal of contaminated soil located beneath the rail tracks at the derailment location. The disposal location transportation route(s) shall be subject to EPA approval. The removal and disposal of the soil beneath the first track to be addressed shall be completed on or before the close of business on March 10, 2023. The removal and disposal of the soil beneath the second track shall be completed on or before the close of business on March 20, 2023.

4. On or before February 27, 2023, submit to EPA for its review and approval a written description of how NSR intends to proceed with soil sampling and analysis of residential, commercial, and agricultural properties in the Village of East Palestine. The written description of the soil sampling and analysis plan shall provide that

    sampling shall commence by March 1, 2023, and that sampling and analysis shall be completed on or before the close of business on March 31, 2023.

5. On February 25, 2023, begin participating in the Unified Command at the Site as directed by the OSCs.

(*See*, February 24, 2023 directive letter from EPA to NSR, hereinafter "Directive", attached hereto as Exhibit "A").

Following the February 3 derailment, the National Transportation Safety Board ("NTSB") had control of the factual investigation into the derailment and control of the derailment site. On Thursday, February 23, NSR was advised by NTSB that it would lift its hold on the 11 hazardous material railcars at the site the following day. Immediately, counsel for Norfolk Southern sent letters to all known Plaintiffs' attorneys, car owners, and shippers, notifying them of NTSB's release of the 11 hazardous material railcars and inviting them to inspect the cars on February 28, 2023 and March 1, 2023.[1] (*See* Doc. 11-1). Currently, 9 of the 11 hazardous material railcars remain at the site. Pursuant to agreement with Plaintiffs' counsel in this case, two (2) benzene residue cars that were neither breached nor leaking following the derailment were moved to Conway Yard in Conway, Pennsylvania where they will be available for inspection on the above dates. One (1) other residue car remains at the site. Pursuant to EPA's Directive, the removal and disposal of the residue from these cars must be completed by March 10. (Exhibit "A", ¶ 2). These residue cars will be sent to a facility to be cleaned.

Additionally, EPA has directed that NSR remove the soil underneath track 1 by March 10, and track 2 by March 20. (Exhibit "A", ¶ 3). The remaining railcars must be removed

---

[1] Presently, only counsel for Plaintiffs in this case, in the <u>Canterbury</u> case (4:23-cv-298-BYP), one lawyer representing a single East Palestine resident, and the owner/shipper of railcar DOWX 73168 have responded in the affirmative of their intention to inspect the railcars.

from the site for NSR to comply with EPA's Directive. Further, attempts at moving the remaining cars from the site risks their further destruction.

## II. ARGUMENT

### A. NORFOLK SOUTHERN MUST COMPLY WITH THE EPA DIRECTIVE, AND THE DISTRICT COURT DOES NOT HAVE JURISDICTION TO HEAR A CHALLENGE TO THAT ORDER UNDER CERCLA

The EPA's February 24 Directive was issued pursuant to the National Contingency Plan ("NCP"). The purpose of the regulation under which the Directive was issued is to provide a unified organizational structure and procedures for preparing for and responding to the releases of hazardous substances. The NCP reflects the coordination of relevant federal agencies to avoid inconsistent or duplicative requirements in the emergency planning responsibilities.

The EPA's Directive to NSR was issued pursuant to its authority under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). CERCLA is the federal law that provides for the clean-up of sites contaminated by hazardous waste. Authority under CERCLA is granted to the President of the United States. However, the President has delegated most of the authority under CERCLA to the EPA. The primary purpose of CERCLA is "the prompt cleanup of hazardous waste sites." *J.V. Peters & Co. v. Adm'r, E.P.A.,* 767 F.2d 263, 264 (6th Cir. 1985) (citation omitted). Sections 9604 and 9606 of CERCLA grant the President (now the EPA because the President delegated his power) the authority to initiate removal or remedial actions in sites that have been deemed contaminated and issue administrative orders for abatement actions.

Following the enactment of CERCLA, the EPA revised the National Contingency Plan to provide procedures to respond to releases and threatened releases of hazardous

4

substances, pollutants, or contaminants. The National Contingency Plan vests the "On-scene coordinator" with the power to direct and coordinate all response efforts at the scene of a discharge. Here, the On-scene coordinator exercised its power to direct NSR to undertake the removal of contaminated substances from the derailment site. In order to prevent the "On-scene coordinator" from ordering the removal of contaminated substances from the site, Plaintiffs would have to challenge the EPA's letter to NSR directing it to begin the process of removing the hazardous waste and other materials from the site.

However, district courts have found that Section 9613(h) of CERCLA severely limits a district court's jurisdiction to hear claims arising under CERCLA. 42 U.S.C. § 9613(h). Specifically, the relevant portion of Section 9613(h) provides that:

> No federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial actions. . . under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:
> (1) an action under section 9607 of this title to recover response costs or damages or for contribution.
> (2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.
> (3) An action for reimbursement under section 9606(b)(2) of this title.
> (4) An action under section 9659 of this title (relating to citizen suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.
> (5) An action under 9606 of this title in which the United States has moved to compel a remedial action.

42 U.S.C. § 9613.

In other words, courts have found that the purpose of Section 9613(h) is to limit the public's ability to challenge EPA clean-up decisions and bolster CERCLA's goal of granting the EPA "full reign to conduct or mandate uninterrupted clean-ups for the benefit of the environment and the populous." *B.R. MacKay & Sons, Inc. v. United States,* 633 F. Supp. 1290,

1292 (D. Utah 1986). Plaintiffs thus have to establish that their challenge to the EPA Directive falls under one of the 5 exceptions listed under 42 U.S.C. § 9613. Plaintiffs cannot establish that one of the exceptions applies because the exceptions listed in 42 U.S.C. § 9613 are limited to situations where the EPA begins an enforcement action to force a party to comply with a removal or remedial action order or situations where a party files suit against the EPA seeking to recover the costs it expended in cleaning up a contaminated site.

In sum, the EPA directed NSR to initiate removal/remedial action at the site pursuant to CERCLA sections 9604 and 9606. NSR must comply with that Directive or be subject to potential liability for not complying with the Directive. Plaintiffs therefore must challenge the EPA Directive and ask this court to issue an order that would supersede the EPA's Directive. However, the EPA is the agency authorized to enforce CERCLA, and the district court does not have jurisdiction to hear a challenge to the EPA Directive based on the jurisdiction stripping provisions of CERCLA Section 9613.

### B. IN THE ALTERNATIVE, PLAINTIFFS HAVE NOT MET THEIR BURDEN FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs' Motion seeks both a temporary restraining order ("TRO") and a preliminary injunction. The Court applies the traditional four-part test to determine whether a TRO (or preliminary injunction) is appropriate. The Court must consider whether: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The Court must balance these factors against each other. *Id.* Ultimately, a TRO is an extraordinary remedy whose purpose is to preserve the status

quo. *Ingham v. Toledo City Sch. Dist. Bd. of Edn.*, 339 F. Supp. 2d 998, 1003 (N.D. Ohio 2004). Preliminary relief may only be granted where "the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573. A plaintiff must establish its right to relief by clear and convincing evidence. *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998).

> 1. <u>Likelihood of Success on the Merits</u>

It is premature for any analysis of likelihood of success on the merits, and therefore, Norfolk Southern will not address this factor and does not concede that Plaintiffs will likely prevail on the merits.

> 2. <u>Irreparable Harm</u>

"Irreparable harm is an 'indispensable' requirement for a preliminary injunction, and 'even the strongest showing' on the other factors cannot justify a preliminary injunction if there is no 'imminent and irreparable injury.'" *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019)). "[W]hether an injury is irreparable will turn on whether compensatory damages would be an adequate remedy for the harm suffered." *Id.* (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("[H]arm is not irreparable if it is fully compensable by money damages")). Further, "injunctive relief is not available for harm that will occur in the indefinite future." *Brooks v. Ohio State Chiropractic Bd.*, 2012 U.S. Dist. LEXIS 57673, at *10 (S.D. Ohio Apr. 25, 2012).

Even if this Court were to consider irreparable harm, Plaintiffs cannot meet their burden because:

      i. Plaintiffs will have access to the railcars on site for two days, which will allow their representatives/experts to examine the railcars. Plaintiffs have already stated their experts will attend on February 28 and March 1.

      ii. Although Plaintiffs want the railcars to stay in place, it is important for the Court to know that the railcars were already moved from their original location at the time of the derailment as part of the immediate response.

      iii. The NTSB took possession and has control of certain parts of the cars that it considered important to its investigation of the derailment, including the top fittings and relief valves from the five (5) vinyl chloride cars and the wheel bearing and wheel set from the first derailed car.

As discussed further below, the balancing of the equities weighs against granting a TRO in any event, but the absence of irreparable harm, the "essential" requirement, means that Plaintiffs' Motion must be denied.

    3.    <u>Substantial Harm to Others</u>

While Plaintiffs argue that no third parties will be harmed by the requested TRO, they cannot deny that a TRO will have a negative impact on NSR's cleanup efforts, and by consequence, a negative impact on the community as a whole. NSR has made continuous efforts to assist the community following the February 3 derailment, and those efforts include working to clean up the site, as directed by EPA, and to resume normal operations as expeditiously as possible. Plaintiffs seek to impose a blanket order prohibiting NSR from continuing this work until, in their sole discretion, it can continue. Such an order will work harm not only on NSR, but the community as a whole, and the harm to others outweighs any benefit to Plaintiffs by indefinitely suspending the cleanup operations.

The EPA has issued a Directive for NSR to immediately remediate the soil at the site, among other things. Pursuant to EPA's Directive, NSR must remove the soil underneath track 1 by March 10, and track 2 by March 20. (Exhibit "A", ¶ 3). The remaining railcars must be removed from the site for NSR to comply with EPA's Directive, as the soil under the railcars

must be addressed. Along with EPA and Ohio EPA, the citizens of East Palestine want the site to be cleaned up.

    4.    <u>Public Interest Considerations</u>

While in many cases the issuance of a TRO or preliminary injunction has little effect outside of the immediate litigation, in this case the impacts of issuing the TRO go far beyond the immediate effects on the parties. While the public certainly has a general interest in the orderly conduct of civil litigation, including inspections, in this case the public has a specific interest in remediating the derailment site and restoring the area to its pre-derailment condition. Further, government agencies have determined, and specifically by EPA's Directive, that the prompt remediation of the site is a priority. The public interest therefore, weighs against granting Plaintiffs' broad TRO request to essentially halt all activity until Plaintiffs decide it can continue. Allowing the Plaintiffs to hold the public's interest hostage to their own interests in this case does not work to benefit the public at large. The public will be greatly benefited by the full and complete remediation of the derailment site and the balance of this factor militates against granting the TRO.

### III. CONCLUSION

For the foregoing reasons, Defendants, Norfolk Southern Corporation and Norfolk Southern Railway Company, respectfully request this Honorable Court deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

DICKIE, McCAMEY & CHILCOTE, P.C.

By: /s/Scott D. Clements
    J. Lawson Johnston, Esquire
    Scott D. Clements, Esquire

    Two PPG Place, Suite 400
    Pittsburgh, PA 15222
    (412) 281-7272

    Attorneys for Defendants,
    Norfolk Southern Corporation and
    Norfolk Southern Railway Company

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2023, I filed the foregoing **Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction** with the Clerk using the CM/ECF System, which will send notification of such filing to all counsel of record.

DICKIE, McCAMEY & CHILCOTE, P.C.

By: /s/Scott D. Clements
    Scott D. Clements, Esquire

    Attorneys for Defendants,
    Norfolk Southern Corporation and
    Norfolk Southern Railway Company

15907939.1